Phillip S. Coffer v. Commissioner.
Phillip S. Coffer v. Commissioner
Docket No. 26785.
United States Tax Court
1952 Tax Ct. Memo LEXIS 261; 11 T.C.M. (CCH) 346; T.C.M. (RIA) 52100; April 10, 1952
*261 A. R. Kehoe, Esq., 610 Colman Bldg., Seattle, Wash., for the petitioner. J. D. Picco, Esq., for the respondent. MURDOCK Memorandum Opinion MURDOCK, Judge: The Commissioner determined a deficiency in income tax for 1944 in the amount of $46,506.92 and an addition to the tax under section 293(a) in the amount of $2,325.35. The petitioner assigned the following as errors in the determination of the Commissioner: (a) "In taxing petitioner on all of the income of the C. & H. Supply Company of Seattle, Washington, for the taxable year ending December 31, 1944," (b) in failing to recognize that the statute of limitations against assessment and collection had expired before the mailing of the notice of deficiency.the parties filed a stipulation of facts which is adopted as findings of fact. The petitioner filed his individual income tax return for the calendar year 1944 with the collector of internal revenue for the District of Washington on June 15, 1945, to which date extensions had been granted. The notice of deficiency was mailed to the petitioner on December 12, 1949. The petitioner and Miriam Coffer were married in California in 1926. They had one child, a son, *262 named Donald Coffer. The petitioner and Miriam experienced marital difficulties. They separated at sometime prior to July 30, 1943 and never thereafter lived together as husband and wife. Miriam had a divorce complaint served on the petitioner on August 9, 1943 but the complaint was never filed with any court. The petitioner and Miriam, both represented by counsel, entered into a written property settlement agreement on October 29, 1943 and acknowledged it on that same day before a notary public. The agreement was as follows: "IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON IN AND FOR COUNTY OF KING Miriam Coffer, Plaintiff, v. Phillip Coffer, Defendant. No. 364977. Property Settlement Agreement. "THIS AGREEMENT made and entered into this 29th day of October, 1943 by and between Phillip Coffer, hereinafter referred to as First Party and Miriam Coffer, hereinafter referred to as Second Party, both of Seattle, King County, Washington, "WITNESSETH: "WHEREAS, the respective parties hereto are husband and wife and have heretofore separated and are now living separate and apart; and "WHEREAS, the above entitled action has been brought by the said Miriam Coffer for the *263 purpose of securing a divorce from said Phillip Coffer; and "WHEREAS, it is the desire of the respective parties hereto to make and execute this agreement as a separation agreement and as a complete and final property settlement aggreement between the parties; now, therefore, "IT IS HEREBY AGREED AS FOLLOWS: "I. "The First Party agrees to pay to Second Party the sum of THIRTY FIVE THOUSAND AND NO/100 ($35,000.00) DOLLARS AS FOLLOWS: "TWENTY THOUSAND AND NO/100 ($20,000.00) DOLLARS in cash at the time of the execution of this agreement; FIVE THOUSAND AND NO/100 ($5000.00) DOLLARS on or before January 2nd, 1944; FIVE THOUSAND AND NO/100 ($5000.00) DOLLARS on or before June 1st, 1944; FIVE THOUSAND AND NO/100 ($5,000.00) DOLLARS on or before December 1st, 1944. "II. "The First Party agrees to pay to the Second Party the sum of FIVE HUNDRED AND NO/100 ($500.00) DOLLARS per month as alimony money for a period of twelve (12) months commencing on the 1st day of November, 1943. "III. "The First Party further agrees to pay to the Second Party an additional sum of FIVE THOUSAND AND NO/100 ($5000.00) DOLLARS on or before January 15th, 1945, provided that First Party's net income, *264 after deduction for income and Victory Tax for the year 1944 is the sum of TWENTY FIVE THOUSAND AND NO/100 ($25,000.00) DOLLARS or more; likewise to pay to Second Party an additional sum of FIVE THOUSAND AND NO/100 ($5,000.00) DOLLARS on January 15th, 1946, provided that First Party's net income, after deduction for income and Victory Tax for the year 1945 is the sum of TWENTY FIVE THOUSAND DOLLARS ($25,000.00) or more; likewise to pay to second party an additional sum of FIVE THOUSAND AND NO/100 ($5000.00) DOLLARS on or before January 15th, 1947, provided that First Party's net income, after deduction for income and Victory Tax for the year 1946 is the sum of TWENTY FIVE THOUSAND AND NO/100 ($25,000.00) DOLLARS or more. In the absence of fraud or concealment, the amount of such net income, as shown by First Party's income tax return filed with the Federal Government shall be used as a guide to determine whether or not the contingent payments herein provided for are due to Second Party. In the event that First Party's income tax return, as filed, should show less than the TWENTY FIVE THOUSAND AND NO/100 ($25,000.00) DOLLARS net income, after deductions for income and Victory Tax, but *265 should later be changed, raised or adjusted by the Internal Revenue Department, then the changed, raised or revised figures as shown by the final settlement of the tax shall govern. "Second Party shall be entitled to examine First Party's returns in any year in which First Party claims that his income is below the amount requiring a payment to Second Party as hereinabove provided, but Second Party shall not be entitled to examine First Party's return during any year in which First Party makes the payment herein provided for. The provisions of this paragraph shall be sufficient authority for the Internal Revenue Department to furnish to Second Party a certified copy of First Party's return for any one of the particular years herein involved. "In the event that First Party and Second Party are divorced and that First Party should remarry, then, for the purposes of this paragraph, net income shall mean First Party's personal earnings and income regardless of whether the same belongs to, or are divided with some other new community or wife. "IV. "First Party agrees to pay to Second Party the sum of FIFTEEN HUNDRED AND NO/100 ( $500.) DOLLARS per year for the care, support and maintenance *266 and education of the parties' minor son, Donald Coffer, until said minor son reaches the age of 18 years, said sum to the paid in monthly installments of ONE HUNDRED TWENTY FIVE AND NO/100 ($125.00) DOLLARS per month commencing on the 1st day of November, 1943, First Party to have the right to claim said son as a dependent for the purpose of income and Victory taxes. "V. "It is understood that the parties have a policy of life insurance in the sum of FIVE THOUSAND AND NO/100 ($5000.00) DOLLARS on the life of First Party, said policy being Policy No. 1538373 with Travelers Life Insurance Company. Beneficiaries now named in said policy are Second Party as primary beneficiary with said Donald Coffer as secondary beneficiary. It is agreed by parties hereto that First Party is hereby given authority to change the beneficiary to Donald Coffer. It is agreed that First Party shall pay the premiums on said policy and to keep the same in full force and effect. It is further agreed that said policy or the cash surrender value thereof shall be considered a trust fund for the purpose of paying for the college education of said minor child. In the event of First Party's death, then the proceeds *267 or said policy shall be received and held by Second Party as guardian for said minor son. "First Party agrees that he will not change the beneficiary from Donald Coffer. "VI. "First Party agrees to execute and deliver to Second Party a deed to the parties' home located at 5854 Penrith Road, Seattle, King County, Washington, which is more particularly described as follows: * * *
vesting the title to said real property in Second Party as her own, sole and separate property free of any right, title, claims or interest of First Party. "First Party also agrees that Second Party shall have as her sole and separate property, and first Party hereby transfers and assigns to Second Party, all of the household furniture, fixtures and equipment and apparatus now located in the above described home. "First Party also agrees that Second Party shall have as her own, sole and separate property that certain 1941 Chevrolet Coupe automobile, now in her possession, and also, any other cash, bonds and other items of personal property now in her possession. "VII. "First Party shall have as his own sole and separate property THIRTY SIX HUNDRED (3600) shares of Garrett Corporation stock *268 now in his possession; any and all interest of the parties in and to 'Coffer and Houston' a co-partnership and any and all of its subsidiaries and affiliated companies or organizations, and also any and all other community moneys, stocks, bonds, real or personal property which is not given to First Party by the foregoing provisions of this agreement. "VIII. "First Party agrees to pay and discharge all community bills and obligations owing as of the date of this agreement. Second Party represents and warrants that she has not created any such liabilities or obligations which are unknown to First Party. First Party shall pay and discharge the balance of all Federal income tax due from either First Party or Second Party for either or both of the years 1942 and 1943. "IX. "First Party agrees to pay or cause to be paid to Second Party's attorneys, the firm of Lycette, Diamond and Sylvester, the sum of FIVE HUNDRED ($500.00) DOLLARS as attorneys' fees, in the event an interlocutory decree of divorce is obtained by either party hereto. "X. "It is agreed that in the event a divorce is hereafter granted to either of the parties hereto, that the permanent care, custody and control *269 of the parties' minor child, Donald Coffer, shall be awarded to Second Party with the right reserved to First Party to see and visit and have said child for visiting at all reasonable times and places, provided, however, that Second Party shall not be required to keep said minor child within the State of Washington. "XI. "It is agreed that this contract shall constitute a full, complete and final division and settlement of the property rights of the parties and of all rights of Second Party to care, support, maintenance or alimony from First Party. "It is further agreed that a copy of this agreement shall be introduced as evidence as a final property settlement agreement between the parties hereto, in the above entitled action, and that neither party shall seek any further relief in said proceedings in connection with property, support, alimony, or otherwise than is provided for herein." * * *
The parties carried out the above property settlement agreement in accordance with its terms. The record does not show that Miriam ever claimed or received any of the income of the petitioner for 1944 except as he may have used it to make the payments required under the property *270 settlement agreement. The petitioner conveyed the residence property to Miriam by a warranty deed on November 1, 1943 and Miriam sold that property, as her separate estate, to third parties for $19,500 on January 1, 1944. An amended complaint in divorce was prepared and verified by Miriam on or about November 14, 1943 but was not served on the petitioner until August 20, 1945. It was similar to the original complaint but omitted charges in the first complaint that the petitioner had consorted with a woman named Mabelle Prassas, stated that the parties had "entered into a property settlement agreement in writing, adjusting their property rights," and asked the Court to approve the property settlement of October 29, 1943. The amended complaint was filed as Cause No. 364,977 in the Superior Court of the State of Washington for King County on August 20, 1945. The property settlement agreement referred to above was filed with the county clerk on August 29, 1945. An interlocutory decree of divorce was entered on August 29, 1945 and a final decree was entered on March 26, 1946. The record does not show when the petitioner and Miriam began to reside in the State of Washington, but Miriam *271 alleged in the complaint sworn to on July 30, 1943 that she had been a resident of Seattle for more than one year. The petitioner was a resident of Seattle during 1944, but Miriam did not reside in Washington at any time during that year. The C. & H. Supply Company, also known as "Coffer and Houston," was a partnership between the petitioner and W. K. Houston entered into in 1941. The petitioner's distributive share of net income of that partnership for 1944 was $109,022.60. The petitioner's individual income tax return for 1944 showed, inter alia, the following: 3. Enter here the total amount of
your dividends and interest (in
cluding interest from Govern-
ment obligations unless wholly
exempt from taxation)
$ 1,440.00
4. If you received any other income,
give details on page 3 and enter
the total here
110,835.60
5. Add amounts in items 2, 3, and 4,
and enter the total here
$112,275.60
If item 5 includes income of both
husband and wife, show hus-
band's income here, $ ;
wife's income here $ One-half community
$ 56,137.80 Item 4 was shown on page 3 to include the petitioner's distributive share of the partnership income and $1,813, representing *272 one-half of a long--term capital gain from the sale of the residence which the petitioner had transferred to Miriam in 1943 and which she had sold as her separate property on January 1, 1944. The tax shown on the petitioner's return was computed on $56,137.80. The petitioner had the accounting firm which prepared his return prepare an individual income tax return for Miriam for 1944 on which $56,137.80 was reported as "One-half community" income. Her son was claimed as a dependent on that return. Miriam did not sign that return. It was filed by the petitioner on June 15, 1945 and he paid the tax shown to be due on that return. The Commissioner, in determining the deficiency, held that the petitioner's gross income should include all of the dividends and all of the partnership income. He excluded the capital gain. He explained: "In October 1943 you entered into a complete and final property settlement agreement with your former wife, Miriam Coffer (now Mrs. Miriam Britton). It is held that all income received by you in 1944 from the properties designated in the agreement as your sole and separate property should have been reported by you, and no portion thereof may be considered *273 as income of Miriam Coffer (now Miriam Britton). * * *
"It has been determined the portion of the capital gain on the sale of a house which you reported as income is the separate income of your former wife. * * *" The petitioner contends that all of his income for 1944 was community property of which he was required to report only one-half. The Commissioner concedes that it would have been community property but for the separation and the property settlement agreement of October 29, 1943 under which all of the property of the petitioner became separate property. Both parties agree that a husband and wife subject to the community property laws of Washington may, by agreement, change the character of their property, including their future earnings, from community to separate property so that each will thereafter be taxable on all of his own earnings. It is not claimed that creditors were adversely affected by the agreement. Thus, the question for decision is whether the parties by their final property settlement agreement of October 29, 1943 intended that the earnings of the petitioner from the partnership for 1944 were to be his separate property. The petitioner's first argument *274 against the determination of the Commissioner is that the property settlement agreement of October 29, 1943 was not to take effect until Miriam obtained a divorce. The petitioner and the attorney who represented him in the property settlement arrangements testified in this proceeding. Counsel for the petitioner in the present proceeding led those two witnesses to state that they understood, as an unwritten condition of the settlement, that Miriam would obtain a divorce. The petitioner also stated that there was a possibility of a reconciliation when he visited Miriam in May 1944 in San Francisco. The property settlement agreement and the divorce proceedings show, without the testimony, not only that Miriam intended to obtain a divorce but that she actually received one. The testimony does not cast doubt upon the terms of the property settlement agreement, which conclusively demonstrates that most of its provisions, including those relating to the future earnings of the petitioner, were intended to take effect immediately upon the execution of the agreement. Cf. ; , certiorari *275 denied . The parties were already living apart, and they expressed a desire to make permanent arrangements for a division of their property so that they could remain apart. Paragraphs IX and X are expressly conditioned upon a decree of divorce, which is some indication that other provisions not expressly made contingent upon the granting of a divorce were not intended to be contingent upon the granting of a divorce but were to take effect at once. The agreement is a present agreement described as a complete and final settlement. It required the petitioner to pay $20,000 to Miriam upon the execution of the agreement and, in Paragraphs I and II, to make other payments to her at stated intervals beginning immediately upon the execution of the agreement and all ending in 1944, without regard to whether or not she had obtained a divorce at the time any payment became due. It required the immediate transfer of the family home to Miriam and an immediate division of all of the properties owned by the petitioner and of all community property. The provision in Paragraph VIII for the immediate payment of community debts and the payment of income taxes for 1942 and 1943 *276 implies that there were to be no more community debts or taxes. The agreement was carried out in accordance with its terms. The petitioner transferred the home to Miriam and she sold it as her separate property on January 1, 1944. She took the other property allotted to her and moved away from Seattle. The petitioner paid to her the large sums called for under the agreement prior to the filing of the complaint in divorce. The parties made no provision for undoing any of those things in case a divorce was not granted. The stipulated facts, considered in the light of the testimony, lead inevitably to the conclusion that the parties intended this agreement to take effect immediately. Cf. . The petitioner next argues that the agreement was not intended to affect his future earnings, particularly his distributive share of the net income of the partnership. The statutes of Washington provide that "property" acquired during the marital status belongs to the community. The term "property" is intended to include earnings of either spouse. Remington's Revised Statutes of Washington, section 6890 et seq. The parties agreed in Paragraph *277 VII of their property settlement agreement that the petitioner should have as his sole and separate property "any and all interest of the parties in and to 'Coffer and Houston,' a co-partnership and any and all of its subsidiaries and affiliated companies or organizations, and also any and all other community moneys, stocks, bonds real or personal property which is not given to First Party by the foregoing provisions of this agreement." It is reasonable to conclude from those words and from other provisions of the agreement that in giving the interest in the partnership to the petitioner they meant that any distribution which he might be entitled to receive from the partnership in the future would be a part of that property and therefore his separate property. Cf. ; , appeal dismissed , on basis of . Some of the other provisions which lead to this same conclusion are those of Paragraph III in which the income for later years is referred to as the petitioner's and those of Paragraphs I and II under which *278 the petitioner is required to make substantial payments of money to his wife beginning immediately upon the execution of the agreement and ending on December 31, 1944. It would be unreasonable to suppose that the wife was to receive those payments and still be entitled to one-half of the petitioner's distributive share of the net income of the partnership until such time as they would be finally divorced. Such an interpretation would have left the petitioner little to live on and does not seem to have been the intention of the parties. The petitioner's final basis of resistance to the logic of the Commissioner's argument and determination is that Miriam had a community interest in the 1944 income of the petitioner to the extent of the payments provided for her in 1944 under the property settlement agreement. A simliar argument was made and rejected by this Court and by the Court of Appeals for the Ninth Circuit in , affirmed , and in , affirmed . The petitioner has not shown any error in the determination of the Commissioner. The *279 notice of deficiency was not mailed within three years but it was mailed within five years after the filing of the petitioner's return for 1944. Section 275(c) provides a five year period of limitations "If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return * * *." Obviously that provision applies in this case unless the taxpayer is right in his argument that the "gross income" shown on his return was not the $56,137.80 which he designated as his one-half of the community income but was $112,275.60, the amount shown on line 5. This provision of the statute does not refer to any amounts which may be shown on a return but which the taxpayer is not there reporting as his own gross income for the purpose of computing his own tax. The petitioner in his return was reporting that only one-half of the total community income, or $56,137.80, was his gross income. That is the amount of gross income with which he started the computation on page four of his return to arrive at net income and the amount of tax owed. A similar contention was decided against the petitioner in *280 The petitioner in that case showed on his return the total community income and then reported that only one-half of that amount was his share for tax purposes. That case is not distinguishable. Section 275(c) applies and gave the Commissioner a five year period within which to mail the notice of deficiency. Decision will be entered for the respondent.